No. 16,694.

Peter Kiewit Sons' Company et al. *v.*
Industrial Commission et al.
(236 P. [2d] 296)

Decided September 10, 1951.

218

Messrs. SHUTERAN, ROBINSON & HARRINGTON, Mr. RICHARD L. BANTA, JR., for plaintiffs in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. PETER L. DYE, Assistant, Mr. FRANK A. BRUNO, Mr. JOHN IACOPONELLI, for defendants in error.

*En Banc.*

MR. JUSTICE KNAUSS, delivered the opinion of the court.

PETER KIEWIT SONS' COMPANY and Employers Mutual Liability Insurance Company of Wisconsin bring this cause here by writ of error to reverse a judgment of the Denver District Court in favor of the widow and surviving children of Oscar V. Hyman, who was an iron worker employed on a canal project by the Kiewit Company.

On April 24, 1950, the date of his death, Hyman, from about 8:15 o'clock A.M. to 11:55 o'clock A.M., moved heavy iron rods of varying sizes and shapes, and weighing approximately 150 pounds per bundle, from stockpiles a distance of from 100 to 200 feet over a rough, stony and hilly terrain, to an excavation, and having deposited the rods he climbed from the ditch and returned for additional rods. This work continued without interruption or cessation for more than three and one-half hours. According to the testimony of a co-worker on the project they made about seventy round trips during this period and carried upwards of five tons of rods prior to the collapse of Hyman. They were urged by their foreman to rapidly complete the job so as to be able to go to another assignment the following day. At about 11:55 o'clock A.M. on April 24, 1950 Hyman was at one end of a bundle of rods and another worker was at the other end. As Hyman bent over, apparently to lift his

end of the rods, he collapsed and shortly thereafter died.

The Industrial Commission by its findings, determined that, "The decedent died April 24, 1950, and the immediate cause of his death was an occlusion of the coronary artery with early myocardial infarction. On the morning of April 24, 1950, the decedent went to work at, or shortly after, 8 o'clock and was engaged during almost the entire morning carrying heavy bundles of iron rods. His exertion during that morning was heavier than that usually required and was, in fact, over-exertion. The autopsy report indicates that the occlusion and infarction occurred twelve to twenty-four hours prior to his death. Had his condition been diagnosed this man should have been placed under medical care and at absolute bedrest. At 11:55 o'clock A.M., after a heavy morning's work, he dropped dead.

"The Referee, therefore, finds that death was due to over-exertion, and that under the circumstances disclosed in this case such over-exertion constitutes an accidental injury."

It now is contended by counsel for plaintiffs in error that the findings and award of the commission, are contrary to the law and the evidence, not sustained by a preponderance of the evidence, and that said findings are conflicting, uncertain, and based on conjecture and speculation.

It hence was necessary for the commission to determine whether the death of Mr. Hyman on the premises of his employer, while engaged in the discharge of his assigned duties, was due to accident or disease.

That Hyman was in apparent good health the day before his demise and on the morning when he went to work and during his strenuous labor that day, is amply supported by the evidence. He displayed none of the symptoms reflecting a heart ailment. The report of the autopsy performed by a physician for the insurance carrier indicated that the "occlusion with early myocardial infarction" occurred twelve to twenty-four hours prior

to his death. He added, "Death itself may have occurred due to sudden ventricular fibrillation, although proof of this is lacking."

▮ Compensation is not dependent on the state of an employee's health or his freedom from constitutional weakness or latent tendency. *Allen v. Gettler,* 94 Colo. 528, 30 P. (2d) 1117.

It is urged that this case is governed by our opinion in *Coors Porcelain Co. v. Grenfell,* 109 Colo. 39, 121 P. (2d) 669. In that case it definitely appeared that deceased had a heart dilated to three or four times its normal size, 1000 c.c. of fluid were in the pericardial sac around the heart, and a large mural thrombosis which almost filled the left ventricle of the heart was present. This advanced condition of the heart involvement was of long standing. On the hearing, the commission found that there was *no* over-exertion in the Coors case.

In the instant case the Doctor who performed the autopsy testified that he found the heart of Mr. Hyman to be normal in size; that the epicardium was smooth and glistening, and that this would indicate a healthy condition; that the myocardium was mahogany brown and rather soft, and that this would likewise indicate a healthy organ; that they did find in the lateral apical area of the left ventricle rather dense gray scarred zones, and that the scars indicated a healing to an injury of the organ; that the coronary vessels of the heart were thin and pliable, and that this also indicated a healthy condition; that the raised yellow areas over the intimal surfaces indicated arteriosclerosis, but that this was very slight.

The following inquiries were made of the Doctor and answered at the hearing:

"Q. So that, Doctor, you don't know today, do you, whether or not the employment and the work that this man was doing immediately prior to his death contributed in any way to his death? A. It is a very difficult

thing to answer. Q. It might have, Doctor? A. Or it might not have.

\* \* \*

"Q. Referring to the scarred zones that were found in the heart, would that have any effect on the heart? A. Yes, it makes it an inefficient organ. Q. Weakens the heart? A. That's right, as far as functioning is concerned.

\* \* \*

Q. Doctor, with respect to that last question, you say that it would weaken the heart? A. That's right. Q. Would it weaken so that violent exercise or heavy work caused death? A. It might or it might not, depending upon the extent of the involvement. Q. Would it in this case? You saw the heart. A. Perhaps."

The other physician, Dr. Dennis, testified inter alia as follows: "Q. Now, if a man were engaged—with his occlusion that has been described and which you have testified to, if a man was engaged in violent exercise or heavy work, the chances would be that he would die, wouldn't he, Doctor? A. You said described. You mean some one with an infarction? Q. Yes. A. Or occlusion? Q. Yes. A. He could. Q. So that violent exercise and heavy work might be very definitely a contributing factor to the death? A. I think so."

\* \* \*

"Q. Doctor, if an individual is suffering from an occlusion and death ensues, is it possible to tell whether he died from natural causes or from effort that he might have expended? A. Well, you mean— Q. By natural causes I mean— A. Could you tell whether effort aggravated the condition physically? Q. Well, physically or by natural causes—I mean a continuation of the process which you originally and have previously described that the occlusion is in the process of forming— A. Well, of course, if you find changes in the muscle, then the best you can do, of course, is to conclude that the occlusion had begun to exert itself, its effects at some

earlier time. But of course in that circumstance you still have the factor of increased effort, or physical effort, or emotion, or what not, which might be the turning point in the man's life. That we can't get away from. Q. But can you say whether it was that effort or the natural causes that caused the expiration of the man? A. Oh, I see what you mean. You mean, physically examining the heart, could you tell whether it was due to a natural forming coronary, exclusive of any effort. Q. That's right. A. No, I don't think you could. There wouldn't be any handle by which you could handle it. Q. And would there be any basis on which you could formulate an opinion with regard to that? A. No, other than to generalize as to what might happen under certain circumstances.

\* \* \*

Q. There is no history that this man sustained any pain or showed any of the other symptoms, but the pathologist is of the opinion that the occlusion had existed for that period of time. Now, if an occlusion did exist, would a man be more likely to die if he engaged in violent exercise than if he were sedentary? A. Yes, I think so. I think so, Yes."

■. In *Ellermann v. Industrial Commission,* 73 Colo. 20, 213 Pac. 120, we held that if death was due to overexertion arising out of the employment, then the overexertion was an accident.

■ In the recent case of *Industrial Commission v. Royal Indemnity Co.,* 124 Colo. 210, 236 P. (2d) 293 we held: "If the evidence, and the logical inferences therefrom, can be said to warrant a conclusion that the accident, within a reasonable probability, resulted in the disability, the claimant is entitled to compensation, since he was successful before the commission."

■ We think the evidence in the case at bar relating to the cause of Hyman's death was substantial and credible, which the Industrial Commission believed and that it supports the findings of the commission. This being

so, we would not be justified in disturbing the findings or resulting judgment.

The judgment is affirmed.